# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-1179V

|  |  |
|---|---|
| JODY CALDWELL,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: June 5, 2026 |

*Brian L. Cinelli, Schiffmacher Cinelli Adoff LLP, Buffalo, NY, for Petitioner.*

*Madelyn Weeks, U.S. Department of Justice, Washington, DC, for Respondent.*

## PARTIAL RULING ON DAMAGES[1]

On September 11, 2020, Jody Caldwell filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on September 13, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Respondent conceded that Petitioner was entitled to compensation (ECF No. 29), and the parties have briefed damages (ECF Nos. 68, 73, 75). For the reasons set forth below, I find that Petitioner is entitled to a damages award of **$160,000.00 for actual pain**

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**and suffering, but no component of future pain and suffering.** The remaining damages category, lost wages, requires additional input from the parties.

## I.     Relevant Facts

### A. Medical Records

Prior to vaccination, Petitioner was in treatment with a neurologist for unrelated conditions, and had sustained several falls. Ex. 7 at 8, 19, 24, 34; Ex. 8 at 67. She received a flu vaccine in her left arm on September 13, 2017, at the age of 57. Ex. 4 at 1.

Less than two weeks later (September 24, 2017), Petitioner was seen in a hospital emergency department for left shoulder pain. Ex. 6 at 13-18. She reported that she "had a flu shot 12 days ago at Rite Aid [Pharmacy] in the left arm" and her pain started "right after the shot" and was "getting worse everyday." *Id*. at 16. She rated her pain eight out of ten at worst and two out of ten at best. *Id*. On examination, she exhibited pain with elevation. *Id*. at 17. She was given oral steroids. *Id*. at 12.

The following day (September 25, 2017), Petitioner was seen in her primary care provider's ("PCP") office, reporting left shoulder pain since vaccination. Ex. 7 at 183-84. She described the pain as a "constant dull ache" and reported "sharp pains" with movement. *Id*. at 184. She was on her second day of prednisone, and had tried ice and heat with no relief. *Id*. Her PCP recommended that she continue taking prednisone and return in two weeks for reevaluation and a possible neurology referral. *Id*.

On October 13, 2017, Petitioner saw neurologist James Dematteis, M.D., to follow up on an unrelated condition. Ex. 8 at 53. She also told him that since receiving a flu vaccine "about a month ago" she had experienced "a very painful left shoulder" and left arm weakness. *Id*. On examination, she exhibited "significant pain," weakness related to pain, and "extremely resistant" range of motion ("ROM"). *Id*. at 54-55. Dr. Dematteis assessed Petitioner with left shoulder pain with possible considerations for a rotator cuff tear, bicipital tendinitis, and brachial plexopathy. *Id.* at 55. He prescribed oral steroids, ordered a shoulder MRI and EMG, and referred her to physical therapy ("PT").[3] *Id*.

On November 9, 2017, Petitioner saw Brian Zimmerman, PA-C, at Orthopedic & Sports Medicine to evaluate continuing left shoulder pain. Ex. 9 at 92. Petitioner reported that her "shoulder began bothering her when she received the flu shot." *Id*. Since then, she had been in "severe" pain throughout the day and night. *Id*. She had been taking medication, but nothing helped. *Id*. On examination, any palpitation of her left shoulder exacerbated the pain in her deltoid, acromion, and acromioclavicular joint. *Id*. MRI results showed "increased signal changes posterolaterally in the rotator cuff on the bursal side"

---

[3] Petitioner's records refer interchangeably to physical therapy and occupational therapy. For ease of reference, this Decision refers to both types as PT records.

and "some fluid in the subacromial space consistent with bursitis." *Id*. PA-C Zimmerman's assessed Petitioner with a left shoulder bursal-sided tear or tendinopathy of the rotator cuff. *Id*. at 93. Petitioner was encouraged to begin PT and to undergo a steroid injection, which she declined. *Id*.

On November 15, 2017, Petitioner underwent a PT evaluation of her left shoulder, reporting "significant pain" since vaccination. Ex. 10 at 1. She described her pain as burning, throbbing, and stabbing, and rated it ten out of ten at worst and seven out of ten at best. *Id*. On examination she exhibited reduced ROM, significant pain, and weakness. *Id*. at 2-3. The physical therapist noted that "SIRVA [was] suspected," and recommended PT three times a week for 12 weeks. *Id*. at 3.

On December 1, 2017, Petitioner returned to her PCP to follow up concerning her left shoulder. Ex. 7 at 188. She was given a medical authorization letter restricting her from lifting items over 20 pounds. *Id*. at 194.

On December 12, 2017, Petitioner saw orthopedist Nick Stefanovski, M.D., reporting that she was "still having a lot of pain in her left shoulder." Ex. 9 at 91. Dr. Stefanovski reviewed her earlier MRI results and noted a "partial articular-sided tear of the cuff," with no evidence of "subcutaneous abscess or significant injury to the deltoid." *Id*. He thought there was some inflammation "which could be a result of the flu shot irritating the muscle," although he did not think the "flu shot could cause the changes that the MRI shows in her rotator cuff." *Id*. Petitioner "reluctantly agreed" to have a steroid injection in her left shoulder, which was tolerated well. *Id*. If her shoulder pain persisted, Dr. Stefanovski planned to discuss possible surgical options at her next visit. *Id*.

Between November 15 and December 20, 2017, Petitioner attended a total of 11 PT sessions. Ex. 10 at 5-30. On December 21, 2017, Petitioner requested to be discharged from PT because she was scheduled to undergo surgery in the near future. *Id*. at 31.

*First and Second Surgeries in 2018*

On January 26, 2018 (over four months after the vaccination at issue), Petitioner underwent left shoulder arthroscopy with debridement of the anterior labrum and bursectomy. Ex. 9 at 102-03. Dr. Stefanovski noted that her biceps tendon was intact, with no signs of degeneration, and her biceps tendon anchor and superior labrum were intact. *Id*. at 102. The undersurface of the rotator cuff was found intact with no evidence of a tear, and no pathology was noted with the subscapularis tendon. *Id*. at 102-03. Articular surfaces of the glenoid and humerus showed "a slight amount" of fraying, as did her anterior labrum. *Id*. at 102.

On February 1, 2018, Petitioner underwent a post-operative PT evaluation. Ex. 10 at 33. She described a "[c]onstant throbbing" left shoulder pain that she rated six out of ten, ranging from four at best to ten at worst. *Id*.

3

On February 6, 2018, Petitioner returned to PA-C Zimmerman to follow up concerning her left shoulder pain. Ex. 9 at 90. Petitioner reported that overall "her shoulder feels better than it did preoperatively." *Id*. However, after her surgery she had fallen and reinjured her left shoulder, and a few days before this appointment also experienced a right-side injury due to a fall. *Id*. On examination, her incision was clean and dry, and sutures were removed without difficulty. *Id*. A contusion was noted on her *right* shoulder, but the record does not document any new injury to her left shoulder. *Id*. PA-C Zimmerman recommended that Petitioner continue PT. *Id*.

When Petitioner reported for her seventh post-operative PT session (March 7, 2018), she stated that she "fell on 3/5/18 and does not remember how she fell" but "she hurt her [left] knee and her [left] shoulder as well" and the left side of her face was numb. Ex. 10 at 49. She continued that she may have become unconscious, and had been "forgetting a lot lately." *Id*. She had called her PCP, but no appointments were available for over a month. Id. The therapist contacted Petitioner's orthopedic surgeon and neurologist, and recommended that Petitioner go to the emergency room. *Id*. at 50.

The same day (March 7, 2018), Petitioner was seen in the emergency department for left sided facial and arm numbness that had begun a few days earlier after she fell and hit her head. Ex. 6 at 94. She reported feeling numbness and tingling in her left arm and face, chronic neck pain and nausea. *Id*. at 97. An EKG, labs and CT scan of her brain were unremarkable, and she was discharged. *Id*. at 99-110.

On March 13, 2018, Petitioner saw her neurologist, reporting that she had fallen a week earlier and hit her head, shoulder, and knee, and was unsure if she had lost consciousness. Ex. 8 at 41. She had fallen three times since December, which was unusual for her, and she felt something was wrong. *Id*. She explained that she was under a lot of stress because she was out of work due to her shoulder injury and had no income. *Id*. A brain MRI was ordered. *Id*. at 45.

Petitioner attended an orthopedic follow up appointment on March 20, 2018. Ex. 9 at 89. She reported that in early March, she had fallen and bruised her left shoulder and knees. *Id*. She had not been in PT for two or three weeks, as they wanted clearance from her neurologist, which she had received a day earlier. *Id*. Her orthopedist said she could continue with PT and remain off work for three weeks. *Id*.

At an April 17, 2018 orthopedic follow up, Petitioner was "much better" than she had been prior to surgery, but continued to experience some pain anterolaterally. *Id*. Ex. 9 at 88. She was given additional strengthening exercises and allowed to return to work, with restrictions. *Id*.

On April 23, 2018, Petitioner saw her new PCP, seeking an evaluation for participation in a pain management program for left shoulder and neck pain. Ex. 13 at 7. Petitioner was already taking prescription pain medication, and her PCP determined that

the benefits of continuing her current regimen outweighed the side-effects and potential risks, and it was appropriate for Petitioner to participate in the pain management program. *Id*. at 9-10.

On June 12, 2018, Petitioner was discharged from PT because she had not been seen since late March. Ex. 10 at 55. Petitioner attended a total of eight sessions between February 1 - March 21, 2018. *Id*. at 37-54. At the final PT visit, Petitioner reported that she was told by Dr. Stefanovski's office that there were now concerns with her biceps tendon. *Id*. at 51.

On June 28, 2018, Petitioner returned to Dr. Stefanovski for ongoing left shoulder pain that had become "much worse than it had been." Ex. 9 at 87. Petitioner reported that "she was at work and was lifting something when it went down," and she had experienced increasing pain since that time. *Id*. Dr. Stefanovski was uncertain what was causing her pain, noting that during arthroscopic surgery she had "fairly normal musculature" and "no rotator cuff pathology," just some subacromial bursitis. *Id*. He ordered a second MRI to check for "a new onset of a partial or a complete tear of the [rotator] cuff," and offered a steroid injection, which Petitioner declined. *Id*.

On July 7, 2018, Ms. Caldwell suffered an injury while working. Ex. 10 at 56. She tried to catch a tote that was falling off of a cart. *Id*. "[T]his [movement] 'yanked' her L arm down and re-injured the L shoulder." *Id*.

Petitioner underwent a second MRI (Ex. 6 at 136), then returned to Dr. Stefanovski on July 26, 2018 to review the results. Ex. 9 at 86. Dr. Stefanovski was surprised to see that the MRI showed a full-thickness partial width tear of the supraspinatus tendon near the humeral insertion site and increased signal in the humeral head laterally. *Id*. When he reviewed the images himself, he did not think she had a full-thickness tear, but noted that "the radiologist certainly thinks so." *Id*. Treatment options were discussed, and Petitioner elected to proceed with repeat right arthroscopic surgery, again declining a steroid injection.[4] *Id*.

On August 10, 2018, Petitioner underwent a second left shoulder arthroscopy with debridement of the rotator cuff on the undersurface as well as on the bursal side, bursectomy, and acromioplasty. Ex. 14 at 14-15. Dr. Stefanovski noted that she had a "partial bursal sided tear" of the rotator cuff, in addition to bursitis and impingement syndrome. *Id*. at 14. He added that the undersurface of her rotator cuff "had just a little bit of tear," and he "shaved down some of the reactive synovitis and a little bit of the undersurface cuff involvement." *Id*. at 15.

---

[4] The record of this visit states that Petitioner was seen for "a lot of pain in her *left* shoulder," but agreed to "repeat *right* shoulder arthroscopy." Ex. 9 at 86 (emphasis added). Within the context of the record as a whole, I find that the reference to her right shoulder is likely a typo.

Petitioner underwent a post-operative PT examination on August 20, 2018. Ex. 10 at 56. She rated her pain eight out of ten, ranging from five at best to ten at worst. *Id*. She informed the therapist of the July 2018 work incident that had exacerbated her left shoulder issues. *Id*. She now complained of constant high levels of pain in her left shoulder both at rest and with movement, and difficulty sleeping and performing her usual activities. *Id*. at 56, 57. On examination, her left shoulder passive ROM was 50 degrees in flexion and 40 degrees in scaption, abduction, and external rotation in a neutral position. *Id*. at 57. Her internal rotation in a neutral position was within normal limits. *Id*.

Petitioner saw Dr. Stefanovski for a post-operative appointment on August 23, 2018. Ex. 9 at 85. He stated that the repeat arthroscopy "showed some reactive synovitis, but no intra-articular rotator cuff tear." *Id*. He recommended continued PT. *Id*.

On September 20, 2018, Petitioner went to the emergency department stating that she "[w]as reaching for something last night ….and believes she may have re-injured her left shoulder" following a rotator cuff repair in August. Ex. 6 at 167. She reported numbness and tingling in her left arm and hand. *Id.* at 170. X-rays showed no acute abnormality, and Petitioner was discharged. *Id*. at 172.

Four days later (September 24, 2018), Petitioner followed up with Marjorie Adamus, PA-C, at Orthopedic & Sports Medicine. Ex. 9 at 84. She stated that her shoulder felt "bad" and her symptoms were "different than what they were when she had her previous rotator cuff pathology." *Id*. A week earlier, she reached her left arm above her head and "heard her shoulder pop with immediate pain." *Id*. PA Adamus noted Petitioner's exam was consistent with a biceps tendon pathology and thought she may have strained her biceps tendon. *Id*. Petitioner declined a steroid injection, and was advised to continue PT. *Id*.

On October 2, 2018, Petitioner saw Dr. Stefanovski, reporting "a lot of discomfort" in her left shoulder. Ex. 9 at 83. Dr. Stefanovski described her passive ROM as "good," informing her that her biceps was intact, as was her rotator cuff "for the most part," and another MRI was not necessary. *Id*. He thought it would take three to six months for her to recover. *Id*.

On October 22, 2018, Petitioner saw her PCP for left shoulder pain that was "[r]elated to a work injury" and a "consequence of having had [a] flu shot at work." Ex. 13 at 34. Her pain was not alleviated by pain medication, and she admitted to "doubling up" on medication at times due to persistent shoulder pain. *Id*. On examination, her left shoulder was visibly swollen and exhibited reduced ROM. *Id*. at 35. An MRI was ordered to evaluate for a possible tear of the long head biceps. *Id*. The MRI showed a stable full-thickness supraspinatus tendon tear, with superimposed tendinosis, moderate infraspinatus tendinosis, and increasing subacromial subdeltoid bursitis. Ex. 6 at 215-16.

6

On November 29, 2018, Petitioner returned to her PCP, reporting that she had "reinjured her shoulder and [was] following [up] with the orthopedist and likely will have another surgery." Ex. 15 at 397-98. Petitioner reported that the current dose of pain medication was not completely relieving her pain anymore. *Id*. Petitioner was instructed to increase her pain medication. *Id*. at 400.

On the same day (November 29, 2018), Petitioner underwent an independent medical evaluation of her left shoulder performed by James Faulk, M.D. Ex. 15 at 434. Dr. Faulk assessed that her symptoms were causally related to job injuries, explaining that "she sustained problems with the shoulder after a flu shot and *then had a second injury on her job which resulted in a rotator cuff tear*." *Id*. at 437 (emphasis added). Dr. Faulk therefore determined that the problem with her left shoulder was "causally related to her job injuries." *Id*.

Petitioner attended approximately 25 additional PT sessions between August 20 and December 5, 2018. Ex. 10 at 56-67. By the time of her December 5, 2018 visit, Petitioner was describing her pain as "the wors[t] that it has ever been," ranging between seven and ten out of ten, and she hoped to have surgery soon. *Id*. at 67. Her active and passive ROM remained limited. *Id*. at 68.

On December 6, 2018, Petitioner returned to PA-C Zimmerman for continuing left shoulder pain. Ex. 9 at 80. She stated that since the beginning of October there had been "something wrong with her shoulder." *Id*. On examination, her ROM was limited due to pain, and she exhibited apprehension with movement.  *Id*. at 82. PA-C Zimmerman reviewed the MRI with Dr. Stefanovski and stated that the "MRI reveals a full-thickness rotator cuff tear at the supraspinatus insertion. However, Dr. Stefanovski does not feel as though there is a full-thickness" rotator cuff tear in that area. *Id*.  Dr. Stefanovski referred Petitioner to another orthopedist in his practice for further treatment and recommendations. *Id*. Petitioner again declined a steroid injection. *Id*.

On December 17, 2018, Petitioner met with Dr. Stefanovski's colleague, orthopedist Carl Seon, M.D. Ex. 9 at 79. Dr. Seon reviewed Petitioner's MRI and found a recurrent left rotator cuff tear that "ha[d] never been repaired." *Id*. Petitioner elected to have a third surgery. *Id*.

*Third Surgery in 2019 and Subsequent Treatment*

On January 25, 2019, Dr. Seon performed a third left shoulder revision subacromial decompression, limited debridement of the left acromioclavicular joint, and arthroscopic rotator cuff tear. Ex. 14 at 35. During surgery, he observed "a near full-thickness tear of the supraspinatus toward its insertion in the greater tuberosity." *Id*. at 36.

At a post-operative appointment on February 7, 2019, Petitioner stated she was "miserable" and this was "the worst it has been." Ex. 9 at 71. Her incisions were clean

7

and healing, and sutures were removed. *Id*. at 74. She was instructed to continue wearing a sling for four more weeks. *Id*. The following month (March 11, 2019), she was still in constant pain but was doing "okay." *Id*. at 61. She was instructed to start PT. *Id*.

Petitioner underwent a PT evaluation on March 12, 2019. Ex. 10 at 73. She rated her pain five out of ten, ranging from five at best to ten at worst. *Id*. Although she continued to experience constant pain in her shoulder, after her third surgery the pain was different and less intense than in the past. *Id*. at 75.

On April 22, 2019, Petitioner followed up with Dr. Seon. Ex. 9 at 49. Petitioner reported that a week earlier, she had tripped over her two-year-old granddaughter and landed "hard" on her left shoulder. *Id*. at 52. X-rays were normal. *Id*. Petitioner was directed to continue PT. *Id*. She continued to follow up with her orthopedist over the following months, seeing him on May 23, June 24, August 5, September 9, October 7, November 18, and December 30, 2019. *Id*. at 1, 2, 11, 16, 20, 25, 39.

Between March 12 - September 19, 2019, Petitioner attended approximately 60 additional PT sessions. Ex. 10 at 73-203. At her final PT visit on September 19, 2019, Petitioner stated she "had a lot of pain in her shoulder" a day earlier and continued to experience difficulty sleeping. *Id*. at 203. She rated her pain four out of ten. *Id*. The therapist noted that Petitioner had made "[s]light progress" and tolerated therapy well. *Id*.

At a November 18, 2019 orthopedic appointment, Petitioner reported that she re-injured her left shoulder from a fall on wet ceramic tile on November 7, 2019. Ex. 9 at 2. At this appointment Dr. Seon noted that Petitioner "probably re-injured [her shoulder] again and probably extended her tear." *Id*. Petitioner continued seeing her PCP on a monthly basis for pain medication to treat her left shoulder pain throughout 2019, 2020, and 2021. Ex. 27 at 2-119 Ex. 37 at 2-43.

On July 22, 2021, Petitioner saw orthopedist Dr. Paul Paterson, M.D., of General Physician Orthopedics for a left shoulder evaluation. Ex. 30 at 1. Petitioner rated her pain seven out of ten and "constant" at rest. *Id*. Dr. Paterson noted Petitioner's recurrent rotator cuff tear with three prior surgeries and stated he was reluctant to offer another surgery "as [he was] not sure that the cost benefit ratio exist[ed] to warrant it." *Id*. at 2. Dr. Paterson recommended that Petitioner continue activities to the best of her ability and return in three months. *Id*.

On October 22, 2021, Petitioner returned to General Physician Orthopedics and met with Nicolette Sciolino, P.A. Ex. 32 at 1. Petitioner reported some improvement after her third surgery, but explained that her pain had returned after several falls. *Id*. Cortisone injections did not help, and she anticipated that her pain would "increase over winter like it did last year and she would like Dr. Paterson to reconsider surgery." *Id*. She described constant sharp, shooting pain that she rated seven out of ten. *Id.* Petitioner requested

another MRI. *Id*. PA Sciolino ordered an MRI and instructed Petitioner to use ice and elevate her shoulder. *Id*. at 3.

On November 20, 2021, Petitioner underwent a fourth MRI of her left shoulder. Ex. 31 at 2-3. The MRI showed no evidence of recurrence or retraction of her full-thickness tear, mild tendinopathy of the subscapularis and long head of the biceps tendon, severe fatty atrophy of the infraspinatus muscle belly, mild to moderate degenerative changes, and apparent post operative changes along the acromion. *Id*. On November 29, 2021, Petitioner reviewed her MRI results with Dr. Paterson. Surgical and non-surgical options were discussed and Petitioner elected to proceed with another surgery. Ex. 32 at 6.

On February 17, 2022, Petitioner underwent a reverse total shoulder replacement surgery. Ex. 35 at 13, 23. Her pre- and post-operative diagnoses were as osteoarthritis of the left shoulder and rotator cuff arthropathy.[5] On February 28, 2022, Petitioner saw PA Sciolino for a post-operative follow up. Ex. 33 at 1. Petitioner rated her pain seven out of ten, improving with heat. *Id*. PA Sciolino's assessment was osteoarthritis and presence of left artificial shoulder joint. *Id*. at 3. Petitioner was directed to begin PT. *Id*.

On April 6, 2022, Petitioner attended a post-operative follow up, complaining of "numbness and tingling" and increased pain, which was alleviated by pain medication. Ex. 33 at 5. Physical examination showed mild edema and tenderness over the anterior superior ribs/pectorals region, with her incision healing well. *Id*. at 6. Petitioner's diagnoses remained osteoarthritis and presence of left artificial shoulder joint. *Id*. at 7.

On April 25, 2022 Petitioner followed up with Dr. Paterson, reporting that her pain had increased since her last visit and she now rated it six out of ten.[6] Ex. 33 at 9. She had been seen in the emergency room on April 20, 2022, for pain. *Id*. On examination, her incision had healed, and she exhibited tenderness over her acromion. *Id*. at 10-11. Dr. Paterson assessed her with osteoarthritis and presence of left artificial shoulder joint, and ordered a CT scan. *Id*. at 11.

On June 6, 2022, Petitioner returned to Dr. Paterson, reporting that a steroid injection administered during Petitioner's last visit two weeks prior had not provided any relief.[7] Ex. 33 at 13. Physical examination showed tenderness over the shoulder joint. *Id*. at 14. Dr. Paterson thought she probably had a stress fracture and recommended rest and time. *Id*.

---

[5] The operative note initially referred to *right* shoulder arthropathy. Ex. 35 at 23. A month later, an addendum corrected the note to refer to Petitioner's *left* shoulder. *Id*. at 24.

[6] The assessment refers to both Petitioner's left and *right* shoulders; however, the examination was done on her *left* shoulder. Ex. 33 at 9-11. In the context of the record as a whole, I find the reference to her right shoulder is likely a typo.

[7] It does not appear that a record of this visit or steroid injection has been filed.

On October 17, 2022, on Dr. Paterson's referral, Petitioner saw orthopedist Robert Ablove, M.D. Ex. 38 at 2. Petitioner reported she "had not had any sufficient pain relief" from her prior surgeries, and continued to experience left shoulder pain and limited ROM. *Id*. Dr. Ablove thought some of her pain could be radiating from her neck, and referred Petitioner for a cervical spine evaluation and three-phase bone scan to rule out a stress fracture in her left scapula. *Id*.

On November 16, 2022, Petitioner underwent a three-phase bone scan. Ex. 38 at 7. No scapula stress fracture was seen, but she exhibited mild delayed activity about left shoulder hardware as well as bilateral shoulder arthritic changes and spondylosis. *Id*. Petitioner returned to Dr. Ablove to review bone scan results on November 28, 2022. *Id*. at 8. After discussing treatment options, Dr. Ablove recommended that Petitioner use a sling as needed for comfort, and try acupuncture. *Id*.

### B. Social Security Administration Determination

In July 2020, the Social Security Administration ("SSA") issued a report finding that Petitioner was disabled as of January 1, 2019, and that medical improvement was not expected. Ex. 28 at 1198. The determination was premised on Petitioner's left shoulder injury and two unrelated conditions. *Id*. at 1192, 1195. Her shoulder injury was listed as the "[p]rimary" impairment, and her shoulder injury and one other condition were listed as "[s]evere." *Id*. at 1191.

### C. Worker's Compensation

On August 30, 2018 (hence after the vaccination at issue), Petitioner filed a worker's compensation claim for a "left shoulder rotator cuff" injury which occurred when she reached for a tote that was falling as she was returning items to stock on July 7, 2018. Ex. 15 at 629. On July 13, 2020, Petitioner settled the claim for $13,500.00. *Id*. at 650-53. On the same day, Petitioner resigned from her employment with Rite Aid. *Id*. at 662.

### D. Dr. Seon's Declaration

The orthopedist who performed Petitioner's third surgery, Dr. Seon, has submitted a declaration on her behalf. Ex. 39. He states that Petitioner's three MRIs done prior to her third surgery showed a full thickness supraspinatus tendon tear. *Id*. at ¶ 3. However, her first two surgeries "were arthroscopic in nature and consisted of a limited bursectomy and acromioplasty." *Id*. at ¶ 4. Therefore, he believed that she "had a continuing rotator cuff tear that had never been repaired" in addition to arthropathy and biceps tendinopathy. *Id*. Dr. Seon states that the surgical procedure he performed on January 25, 2019 "confirmed the prior MRI findings regarding the presence of a rotator cuff tear." *Id*. at ¶ 5.

Dr. Seon opines that "the second and third surgeries were related to, and necessitated by, Ms. Caldwell's initial shoulder complaints" following vaccination. Ex. 39 at ¶ 7. Although she experienced subsequent falls and a separate work-related injury,

which resulted in increased shoulder pain, she remained on work restrictions from her initial surgery at that time – suggesting that she had not fully recovered. *Id.* at ¶ 8. Even if these other incidents progressed or worsened her shoulder complaints, it remains his opinion, to a reasonable degree of medical certainty, that the second and third surgeries were necessitated by her original vaccine-related injury. *Id.* at ¶¶ 8, 10, 11.

### E. Affidavits

Petitioner and her daughter each filed an affidavit in support of the claim. Exs. 1, 2. Petitioner's affidavit, signed on September 10, 2020, states that she was an employee at Rite Aid Pharmacy at the time of vaccination, and received the at-issue vaccination at her workplace after her shift ended. Ex. 1 at ¶ 5. She states that the vaccine seemed to be placed higher on her shoulder than usual, and the needle was left in her arm and moved around for a long time. *Id.* at ¶ 7. As soon as it was administered, she felt a "severe and sharp pain" in her left shoulder. *Id.* at ¶ 8.

The next day, she told her daughter what had happened. Ex. 1 at ¶ 9. When she could barely move her arm on the third day, she told one of her assistant managers that her arm was "very sore" from vaccination and she could barely move it. *Id.* at ¶ 10. She took over-the-counter medications and used ice and heat, but nothing helped the pain. *Id.* at ¶ 12.

Petitioner states that PT "did not seem to help much" over the next couple of months, and she continued taking over-the-counter medications and doing home exercises. Ex. 1 at ¶ 18. Her injury affected her ability to do many everyday activities, and she started to become depressed. *Id.* at ¶¶ 18, 19. The cortisone injection she received in December 2017 provided only temporary relief, which did not last long. *Id.* at ¶ 21. After her first surgery her shoulder improved a little at first, although she was still in "significant pain" and was referred to a pain management doctor. *Id.* at ¶ 23.

On July 7, 2018, Petitioner was involved in an incident at work that increased her shoulder pain. Ex. 1 at ¶ 24. She and other employees were unloading a truck and stocking supplies. *Id.* Because she was still on work restrictions, other employees helped her by placing a tote containing supplies on a shopping cart so she could put items on the shelf. *Id.* Unfortunately, the tote began to fall off the cart, and she reflexively reached out with her left hand to stop it from falling – resulting in increased shoulder pain. *Id.*

Petitioner's second surgery did not improve her shoulder. Ex. 1 at ¶ 25. At that point, her orthopedist referred her to his colleague Dr. Seon, a shoulder specialist. *Id.* at ¶ 26. Dr. Seon told her that her rotator cuff tear should have been, but was not, repaired in her previous surgeries, and recommended surgery to repair the tear. *Id.*

Petitioner continued to experience pain after her third surgery, but states that her shoulder felt different and the pain was less intense. Ex. 1 at ¶ 27. Petitioner states that prior to her shoulder injury, she was much more active socially and with her family. *Id.* at

¶ 30. She used to go camping, bowling, and play tennis frequently, but is now unable to do those things. *Id*.

Lauren Peters, Petitioner's daughter and with whom Petitioner lived at the time of vaccination, submitted an affidavit in support of her mother's claim. Ex. 2. Ms. Peters recalled that the day after Petitioner's vaccination, Petitioner said that her left shoulder hurt and that the pharmacist who administered it had left the needle in her arm and moved it around for a long time. *Id*. at ¶ 4. In the following days, Petitioner used ice, heat, and over-the-counter medication for her shoulder pain, without success. *Id* .at ¶ 6.

Ms. Peters states that she met with Dr. Seon after Petitioner's third surgery, and he showed her photographs of Petitioner's torn rotator cuff and said that the prior surgeon had only cleaned and treated the bursa, but had not repaired the rotator cuff. Ex. 2 at ¶ 8. Dr. Seon thought the torn rotator cuff had been contributing to Petitioner's pain all along, and should have been repaired during the previous surgeries. *Id*. Ms. Peters states that Petitioner continues to have extreme difficulty sleeping due to her shoulder pain. *Id*. at ¶ 11.

## II.      The Parties' Arguments

Petitioner seeks a past pain and suffering award of $215,000.00, and a future pain and suffering award of $1,500.00 per year for the remainder of Petitioner's life, reduced to net present value, citing decisions in eight cases, including *Elmakky*, *Lawson*, and *Schoonover*.[8] Petitioner's Damages Brief, filed Sept. 27, 2024, at *35-36 (ECF No. 68-1) ("Pet."). The decisions Petitioner cites involve past pain and suffering awards ranging from $185,000.00 to $210,000.99, and the *Schoonover* and *Hooper*[9] claimants also received awards for future pain and suffering. Pet. at *35-36. Petitioner also seeks lost wages. *Id*. at *36-39.

Petitioner characterizes her injury as a severe SIRVA, asserting that she has endured almost seven years of pain and suffering. Pet. at *31-32. She has undergone four surgical procedures, four courses of PT totaling 88 visits, a steroid injection, oral steroid medication, three MRIs, an EMG, and continues to take significant pain medication on a daily basis. *Id*. at *32. Her shoulder injury has negatively impacted her life, causing sleep difficulties and trouble with routine activities. *Id*. at *33.

Petitioner contends that at least her first three surgeries were required to treat her vaccine-related injury. Pet. at *27. Although her first two MRIs showed a rotator cuff tear,

---

[8] *Elmakky v. Sec'y of Health & Human Servs*., No. 17-2032V, 2021 WL6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021); *Lawson v. Sec'y of Health & Human Servs*., No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021); *Schoonover v. Sec'y of Health & Human Servs*., No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020).

[9] *Hooper v. Sec'y of Health & Human Servs*., No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019).

her first surgeon apparently disagreed that there was a tear, and thus did not perform any repairs during the first or second surgery. *Id*. at *27-28. Therefore, her third MRI continued to show a rotator cuff tear, and Petitioner continued to experience symptoms. *Id*. at *28.

Petitioner then consulted a different surgeon, who disagreed with the earlier orthopedist and found that she had a rotator cuff tear that had not been repaired. Pet. at. *28. And her third surgery confirmed the presence of a tear, which Dr. Seon repaired. *Id*. at *29.

Although Petitioner reported multiple falls in 2018, and an incident at work in July of that year, which increased her shoulder pain, Petitioner asserts that the second and third surgeries were nevertheless necessitated by the original, vaccine-related injury. Pet. at *29. Therefore, Petitioner argues, her pain and suffering and lost wage awards should include the time period of those surgeries and post-surgical care. *Id*. at *29-30. Petitioner adds that a future pain and suffering award is appropriate because she "continues to suffer significant symptomatology," and SSA has found that she is totally disabled and that her condition was not expected to improve. *Id*. at *34.

Concerning lost wages, Petitioner explains that she was out of work for much of 2018, and almost all of 2019, due to her injury. Pet. at *36. She never returned to work following her third surgery. *Id*. Furthermore, SSA adjudged her disabled since January 1, 2019, with a primary alleged impairment of "rotator cuff injury" and a primary impairment finding of dysfunction in her joints. *Id*. at *37.

Petitioner filed an economic loss analysis from Dr. Larry Lichtenstein, who calculated lost wages under two scenarios. Ex. 44. The first scenario assumes that Petitioner would have worked until the age of 65.6, her statistical work life expectancy. Dr. Lichtenstein also calculated lost social security benefits, determining that if Petitioner had worked to age 65.6 instead of being injured, her social security benefit at age 67 would have been greater. Pet. at *38. After taking into consideration adjustments proposed by Respondent, Petitioner seeks lost wages and lost social security benefits (with future components reduced to net present value) in the amount of $118,682.00.[10] Reply at *14.

Petitioner asserts that because she was historically a lower wage earner and did not participate in a defined contribution or defined benefit pension plan, she likely would not have been in a position to retire at age 65.6. Pet. at *38. Thus, Petitioner seeks lost wages calculated using a second scenario assuming that, if not for her SIRVA, Petitioner would have continued working until age 70. In this scenario, taking into account

---

[10] In her opening brief, Petitioner requested $151,798.00 for this scenario, and $272,268.00 under the second scenario. Pet. at *37-38. Because Petitioner agreed to Respondent's proposed adjustments, those figures are used  for calculating lost wages.

Respondent's adjustments, Petitioner seeks lost wages and benefits (reducing the future component to net present value) of $257,404.00. Reply at *14.

Respondent proposes a past pain and suffering award of $80,000.00, but does not cite any decisions in support of this proposal. Respondent's Damages Brief, filed Dec. 13, 2024, at *9 (ECF No. 73) ("Resp."). Respondent argues that during Petitioner's first surgery, her biceps and tendons were found to be intact, with a small amount of fraying of the anterior labrum. Resp. at *3. After this surgery, Petitioner reported multiple falls, work injuries, and other incidents involving her left shoulder. *Id*. at *3-4. Respondent asserts that Petitioner's rotator cuff injury and continued left shoulder pain during this time were the result of these subsequent incidents, rather than her vaccine-related injury. *Id*. at *5. And SSA found that she was disabled for additional reasons, not just her shoulder injury. *Id*.

Respondent argues that Petitioner should not recover lost wage or earning capacity damages. Resp. at *5-6. Respondent repeats that, following the initial round of treatment of her vaccine-related injury, Petitioner suffered falls and other incidents affecting her left shoulder. *Id*. Respondent asserts that Petitioner has not established that her lost wages are a result of her vaccine-related injury rather than these other injuries. *Id*. at *6. As such, Respondent's argument against a lost wage award appears to be premised on his view that Petitioner's care following her first surgery is not related to her SIRVA.

Alternatively, Respondent asserts that Dr. Lichtenstein "provided no justification for calculations to age 70," and using this number nearly doubled the potential economic loss and materially overstated potential damages. Resp. at *6 (citing Ex. A at 13). Additionally, none of Petitioner's other health conditions are factored into how long she would have continued working absent her SIRVA. *Id*. Respondent also asserts that Dr. Lichtenstein's analysis used an annual hours calculation higher than the number of hours Petitioner worked before her injury, resulting in an overstatement of damages. *Id*. at *7 (citing Ex. A at 14).

Respondent also argues that Dr. Lichtenstein's analysis did not consider the additional $20,288.83 that Petitioner received in temporary partial and total workers' compensation benefits in 2018 and 2019. Resp. at *7. And Respondent's expert, Dr. Kennedy, disagrees with the methodology used by Dr. Lichtenstein to calculate present value in that it was based solely on the interest rate on the date he prepared the report. *Id*. (citing Ex. A at 14). Taking all of these factors into consideration, Dr. Kennedy calculated Petitioner's total potential economic loss (including reduced social security benefits, reduced to net present value), as $118,682.00. Ex. A at 15.

Petitioner reiterates on reply that her original rotator cuff injury was not repaired in the first and second surgery, necessitating a third surgery. Petitioner's Reply, filed Jan. 21, 2025, at *2 (ECF No. 75) ("Reply"). She asserts that the similarity of all three MRIs

14

demonstrates that, despite falls or work incidents, Petitioner's original vaccine-related injury persisted at the time of the third surgery. Reply at *2.

Petitioner argues that Dr. Seon's opinion that the second and third surgeries were related to Petitioner's vaccine-related injury is unrebutted, and should be viewed as persuasive evidence. Reply at *7. Petitioner emphasizes that Respondent has not cited any comparable case law that would support his proposed pain and suffering award. *Id* at *12.

Concerning lost wages, Petitioner asserts that Dr. Kennedy's disagreement with Dr. Lichtenstein pertains primarily to methodology rather than conclusion, and that the difference in the end result between the two experts "is so very minimal that Petitioner would simply consent to the proposed discount rate utilized by Dr. Kennedy." Reply at *13. Petitioner concedes that Dr. Kennedy is correct on the offset for workers' compensation benefits, and the total offset should be $33,789.00. *Id*. Petitioner requests that she be awarded either $118,682.00 (based on a presumption that she would have retired at age 65.6) or $257,404.00 (based on an assumption that she would have retired at age 70) in lost income. Reply at *14-15.

## III.    Legal Standard

In another recent decision, I discussed at length the legal standard applicable to determinations of damages, as well as prior SIRVA compensation decisions within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Staub v. Sec'y of Health & Human Servs*., No. 23-1611V, 2026 WL 800520 (Fed. Cl. Spec. Mstr. Mar. 4, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[11]

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings

---

[11] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

damages must be performed in a "cautious manner" in accordance with generally recognized principles and projections." *Brown v. Sec'y of Health & Human Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Human Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and denying to calculate lost wages on a planned business venture); *Dillenbeck v. Sec'y of Health & Human Servs.*, 147 Fed. Cl. 131, 139 (2020) (*citing J.T.*, 2015 WL 5954352, at *7).

## IV.   Appropriate Compensation in this Case

### A. Past Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner underwent a total of four shoulder surgeries following her vaccine-related injury. The parties dispute whether all of these surgeries are attributable to her SIRVA. Petitioner asserts that at least the first three are, while Respondent suggests that only the first surgery is related, and her subsequent sequelae and treatment are attributable to unrelated incidents including several falls and work-related incidents.

The record supports a finding that Petitioner's first surgery (in early 2018) resulted, at least in part, from her SIRVA, and therefore bears on the pain and suffering award to be allowed in this case. That surgery's timing in connection with the vaccination is especially strong associative proof, if nothing else. However, in this case (like many SIRVAs) the record reveals that in the course of the SIRVA's treatment, underlying comorbid conditions – like rotator cuff tears – that *cannot* be deemed a SIRVA sequela, are revealed by imaging. And while subsequent procedures aimed at improving a claimant's shoulder *overall* might include addressing the localized bursitis or tendonitis that the SIRVA is directly responsible for, the SIRVA is not the proximate cause of all that befalls the petitioner in subsequent temporal periods. *See, e.g.*, *Garcia v. Sec'y of Health & Human Servs.*, No. 19-1529V, 2025 WL 1159016, at *8 (Fed. Cl. Spec. Mstr. Mar. 21, 2025) (noting that claimant suffered unrelated conditions contemporaneously with her SIRVA, and stating that "[w]hile her SIRVA may have compounded her pain and suffering connected with these comorbid conditions, it did not cause them, and some distinctions should be drawn as a result"). The longer the course of treatment persists, the more treatment may be oriented toward those subclinical comorbid shoulder issues.

Thereafter, however, this record describes circumstances that are less and less easily associated with a SIRVA, and more credibly with unrelated issues. This is

particularly true of Petitioner's many falls and work-related physical issues. The parties agree that some of Petitioner's symptoms likely resulted from these sources. And Petitioner described the falls as re-injuring her shoulder as well. *See,* e.g., Ex. 15 at 629, 650-53.

Dr. Seon performed Petitioner's third shoulder surgery, and opines that a rotator cuff tear – which had been present on all of Petitioner's previous MRIs – had not been repaired during her first two surgeries. Ex. 39. But this tear could not have been *caused by* vaccination.[12] Accordingly, while treatment of the SIRVA may have been intertwined somewhat with treatment of parallel comorbid conditions impacting Petitioner's shoulder, the medical record evidence starts to suggest after the first surgery in January 2018 that these other issues (amplified by Petitioner's falls and work-associated injuries) were what was worsening Petitioner's course, as opposed to the vaccination. And certainly by the time of the third surgery in January 2019, she experienced some plateauing of symptoms for a year or more, with records from the time of the fourth surgery revealing other explanations for the need for yet more invasive treatment. *See*, *e.g.*, *Williams v. Sec'y of Health & Human Servs*., No. 19-1420V, 2024 WL 914908, at *7-8 (Fed. Cl. Spec. Mstr. Jan. 30, 2024) (finding that claimant's shoulder injury had largely resolved, followed by the claimant falling and re-injuring her shoulder, finding that the claimant had not established that her treatment thereafter was associated with her SIRVA).

Accordingly, the record supports a finding that Petitioner's shoulder pain likely persisted for at least a year, through the first two surgeries, although the number of falls and work-related exacerbations in 2018 (coupled with the rotator cuff tear evidence) make it hard to conclude that even after her *first* surgery most of her complaints could still be attributed to the SIRVA. Otherwise, however, Petitioner experienced persistently high pain levels and limited ROM, and required intrusive and consistent treatment.

The cases Petitioner cites involve claimants whose injuries persisted for longer, without other contributing factors like Ms. Caldwell's, and are not comparable. Respondent, however, has not offered support for his proposed award, which is lower than *any* award in a reasoned SIRVA decision involving surgery.

Petitioner's injury course bears similarities to that in *S.C. v. Sec'y of Health & Human Servs*., No. 19-341V, 2021 WL 2949763, at *5 (Fed. Cl. Spec. Mstr. June 14, 2021). Both Ms. Caldwell and the *S.C.* claimant suffered moderate to severe SIRVAs that

---

[12] *See, e.g.*, *Williams v. Sec'y of Health & Human Servs.*, No. 19-1420V, 2024 WL 914908, at *9 (Fed. Cl. Spec. Mstr. Jan. 30, 2024) (quoting as persuasive an expert report opining that it would be "incredibly difficult, if not impossible" for a flu shot to cause a rotator cuff tear, and considering it more likely that the claimant had a pre-existing tear); *Quantie v. Sec'y of Health & Human Servs.*, No. 18-610V, 2023 WL 2234271, at *9 (quoting claimant's expert as explaining that a SIRVA is not a mechanical injury; "it's not the needle going into the cuff that injures it." Rather, if a vaccine is administered too high on the shoulder, it can over penetrate the deltoid muscle into the bursa or capsule, underneath the rotator cuff, and the vaccine itself can cause pain via two different mechanisms).

they treated with surgery, steroid injections, .and PT. *Id*. at \*7-8. Both sought treatment for their injuries quickly and reported significant pain levels. *Id*. Although the *S.C.* claimant underwent only one surgical procedure, Ms. Caldwell's second surgery was not solely attributable to her vaccine-related injury. Additionally, the *S.C.* claimant's injury persisted for much longer, with much more PT, and, significantly, she did not exhibit comorbid injuries or conditions that contributed to her shoulder pain.

Accordingly, I find that an award of **$160,000.00** for pain and suffering is appropriate.

### B.  Future Pain and Suffering

I have previously stated that SIRVA petitioners often continue to report some residual shoulder pain even after they have largely recovered, and "that fact alone does not typically support a future damages component." *Monson v. Sec'y of Health & Human Servs.*, No. 20-1350V, 2023 WL 2524059, at \*7 (Fed. Cl. Spec. Mstr. Feb. 8, 2023). Instead, a claimant seeking future pain and suffering damages must demonstrate objective proof of medically-documented significant loss of function, or ongoing medical needs that are not expected to abate. *Id*. (citing *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019)).

In this case, Petitioner has not offered such evidence. While she was found disabled and not expected to improve by SSA, this finding was made nearly six years ago, and was premised on her shoulder injury *and* two other conditions, one of which was also designated "severe." Ex. 28 at 1191. And the continuing nature of her shoulder injury is not entirely attributable to her vaccine-related injury; her osteoarthritis, work-related incidents, and multiple falls also contributed. Importantly, she has not offered any evidence of ongoing limitations or concerns. Thus, her request for future pain and suffering damages is denied.

### C.  Lost Wages

It appears that the lost wage information provided by the parties may assume that Petitioner's SIRVA resulted in her disability retirement. In light of my findings herein concerning the duration of Petitioner's vaccine-related injury, it appears that the lost wage calculations may require adjustment.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $160,000.00 represents a fair and appropriate amount of**

compensation for Petitioner's actual pain and suffering.[13]

The parties shall file a joint status report updating me on their efforts to informally resolve lost wages in this case no later than <u>Friday, June 26, 2026</u>. In the status report, they should state whether they believe an informal agreement regarding the remainder of damages in this case can be reached.

At the same time, both parties shall prepare their calculations, arguments, and supporting evidence related to lost wages.

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).